UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| RESIDENTS OF GORDON PLAZA, INC.,<br>*Plaintiff*,<br>v.<br>LATOYA CANTRELL, in her official capacity as Mayor of the City of New Orleans, and the CITY OF NEW ORLEANS,<br>*Defendants.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

COMPLAINT

Plaintiff, Residents of Gordon Plaza, Inc., brings the following allegations against Defendants Latoya Cantrell, in her official capacity as Mayor of the City of New Orleans, and the City of New Orleans:

## INTRODUCTION

1. This is a citizen enforcement suit under the Resource Conservation and Recovery Act, 42 U.S.C. § 6972(a)(1)(B). The case is about inhumane and dangerous living conditions that the Mayor and the City of New Orleans have imposed on residents who live on the Agriculture Street Landfill, including residents of Gordon Plaza. This landfill is a toxic waste dump. The City duped African American residents into purchasing homes on the landfill by failing to disclose that the City of New Orleans ("City") knew the development to be built on toxic waste and contaminated soil.

2. The Agriculture Street Landfill—as a direct result of the hazardous and solid waste it contains—is a blighted area, notable for the remains of destroyed buildings, including an abandoned school, that attracts vermin and potential criminal activity. Living on the landfill, residents are exposed to toxic chemicals and suffer an increased risk of disease and death. The landfill poses unreasonable risks to residents and cannot support a viable community.

3. Approximately 53 occupied households are left on the Agriculture Street Landfill. Several include residents who suffer from cancer and who have lost loved ones to cancer.

## JURISDICTION, VENUE, NOTICE, AND CLAIMS PROCESSING PROVISIONS

4. This Court has original subject matter jurisdiction over this case under the Resource Conservation and Recovery Act, 42 U.S.C. § 6972(a), federal question jurisdiction, 28 U.S.C. § 1331, and the Declaratory Judgment Act, 28 U.S.C. § 2201.

5. Venue is proper in the Eastern District of Louisiana pursuant to the Resource Conservation and Recovery Act, 42 U.S.C. § 6972(a) because the endangerment at issue is in this district.

6. On September 27, 2017, Plaintiff provided Notice of Endangerment under the Resource Conservation and Recovery Act via registered mail, return receipt requested, to the Mayor and the City of New Orleans. Plaintiff also sent this Notice to the Attorney General of the United States, the Administrator of EPA, and the state of Louisiana. The Notice is attached as Exhibit 1 and incorporated pursuant to Fed. R. Civ. P. 10(c).

7. The Defendants received the Notice of Endangerment more than 90 days ago.

8. The September 27, 2017, Notice of Endangerment put the Defendants on notice of Plaintiff's claim.

9. The endangerment at issue in this lawsuit began after Hurricane Katrina destroyed any possibility that EPA's limited removal actions (which occurred during the period from 1994 through 2001) would result in a safe and viable community on the Agriculture Street Landfill. That endangerment is ongoing.

10. This lawsuit is not precluded by governmental action. Specifically, neither EPA nor the state has commenced or is diligently prosecuting an action to abate the endangerment at issue in this lawsuit. Further, neither EPA nor the state is actually engaged in a removal action,

under authority of 42 U.S.C. § 9604, to abate the endangerment at issue. In addition, neither EPA nor the state is diligently proceeding with a remedial action under 42 U.S.C. § 9601, et seq., to abate the endangerment at issue. Finally, no responsible party is diligently conducting a removal action, remedial investigation and feasibility study, or proceeding with a remedial action pursuant to a judicial or administrative order obtained or issued under 42 U.S.C. § 9606, or 42 U.S.C. § 6973, to abate the endangerment at issue.

11. Plaintiff brings this lawsuit for a lawful purpose and not with respect to siting of a hazardous waste treatment, storage, or a disposal facility or to restrain or enjoin issuance of a permit for a facility.

## PARTIES

### *Plaintiff*

12. Plaintiff Residents of Gordon Plaza, Inc. is a corporation formed to help members of the Gordon Plaza residential community. Residents of Gordon Plaza, Inc. has officers and people with indicia of membership who live on the Agriculture Street Landfill. These members seek abatement of the potential endangerment caused by the harmful waste underlying their homes and their community. The presence of hazardous and solid waste at the landfill has made it impossible for properties on the landfill to support a viable community. Residents of Gordon Plaza, Inc. is a "person" under 42 U.S.C. § 6903(15) (defining person to include a "corporation").

13. Plaintiff's members suffer injury and threats of injury from living in a contaminated and blighted area. The area surrounding their community is largely abandoned, contaminated, and blighted because of the Defendants' disposal and handling of hazardous and solid waste. Plaintiff's members' enjoyment of life is impaired by their reasonable concerns that

toxic contaminants may endanger their health. Declarations from Plaintiff's members concerning these injuries are attached as Exhibits 2 through 5.

14. Hazardous and solid waste at the landfill injures Plaintiff's members by preventing them from making normal use of their properties. For example, EPA protocols impose limitations on residents with respect to digging or other activities that might result in contact with subsurface contamination.

15. EPA protocols also purport to modify utilities' normal procedures for excavation and backfill, which limits the willingness of utilities, such as cable companies, to provide services to Plaintiff's members, and creates a risk that utility workers will fail to follow such protocols and thus spread contamination.

16. Hazardous and solid waste at the landfill injures Plaintiff's members by impairing the ability of the community to attract investment and recover from its blighted condition.

17. Hazardous and solid waste at the landfill injures Plaintiff's members by impairing the marketability of their homes.

18. Blight resulting from the hazardous and solid waste injures Plaintiff's members by causing them reasonable concern that blighted buildings will attract vermin and foster crime.

19. Because the City withheld information about the contamination when it participated in marketing homes at Gordon Plaza, and because the City is responsible for the toxic waste at the Agriculture Street Landfill, all of the Plaintiff's members' injuries are and continue to be imposed on them by Defendants.

20. Plaintiff's members' injuries are actual, concrete, irreparable, and traceable to Defendants. Money damages cannot adequately remedy these injuries, which are continuing. The Resource Conservation and Recovery Act empowers this Court to redress these injuries, *i.e.*, "to restrain any person who has contributed or who is contributing to the past or present handling,

storage, treatment, transportation, or disposal of any solid or hazardous waste [that may present an imminent and substantial endangerment to health or the environment,] to order such person to take such other action as may be necessary, or both." 42 U.S.C. § 6972(a). The City of New Orleans is a person who is contributing to the handling and disposal of such solid and hazardous waste.

*Defendants*

21. Defendant Latoya Cantrell is Mayor of the City of New Orleans. She is a "person" as defined under 42 U.S.C. § 6903(15). Through her inaction, Mayor Cantrell is allowing the unlawful endangerment at issue to persist. Mayor Cantrell is sued in her official capacity.

22. Defendant City of New Orleans is a political subdivision of the State of Louisiana and is a "person" as defined under 42 U.S.C. § 6903(15) (defining person to include a "political subdivision of a State").

## BACKGROUND

*The Agriculture Street Landfill*

23. The Agriculture Street Landfill is in New Orleans, Orleans Parish, Louisiana. The site is bordered by Almonaster Boulevard on the west, Higgins Boulevard on the north, Louisa Street on the east, and the Peoples Avenue Canal and railroad tracks on the south. The site covers approximately 95 acres.

24. The City operated the Agriculture Street Landfill as a dump from 1909 until 1957 and reopened it for waste from Hurricane Betsy in 1965-66. During operations, the landfill was subject to spontaneous fires, sometimes blanketing the city with smoke. The Agriculture Street Landfill was New Orleans' primary dumping ground during the 1920s and 1930s. During the 1940s and 1950s, the City sprayed the Agriculture Street Landfill with toxic pesticides.

25. The City disposed of hazardous and solid waste at the Agriculture Street Landfill.

26. Because of the City's disposal of hazardous and solid waste at the Agriculture Street Landfill, levels of dangerous chemicals are present above government standards in areas of the landfill that are accessible to the public.

27. Sampling that chemist Wilma Subra performed on the Agriculture Street Landfill soils after Hurricane Katrina identified contaminants in excess of Louisiana Department of Environmental Quality's Risk Evaluation/Corrective Action Program (RECAP) standards, including without limitation Arsenic (13 mg/kg), Benzo(a)anthracene (900 ug/kg), Benzo(a)pyrene (1200 ug/kg), Benzo(b)fluoranthene (1200 ug/kg), and Indeno(1,2,3-cd)pyrene (720 ug/kg).

28. In the 1970s through the 1980s, the City developed approximately 47 acres of the Agriculture Street Landfill for residential use. Those developments included Gordon Plaza and an elementary school, the Moton School.

29. The City performed soil testing in the Gordon Plaza area in the late 1970s, in anticipation of the construction of the Gordon Plaza single-family homes.

30. As a result of the testing, the City required the developer of Gordon Plaza to add topsoil before constructing homes.

31. The City has never produced a copy of the Gordon Plaza area soil testing, and it has not explained why a copy of such testing was never produced.

32. The City marketed the homes at Gordon Plaza to African Americans. The City targeted this population by providing rent-to-own opportunities and advertising the development as an opportunity to become first-time homeowners and to improve their social and economic situations.

33. When the City marketed the homes at Gordon Plaza, it withheld the fact that the homes were located on top of a toxic dump.

34. The City duped African American residents into purchasing and moving on top of contaminated property.

*EPA and Superfund*

35. Based on risks to public health and welfare, EPA listed the Agriculture Street Landfill as a Superfund Site on the National Priorities List in 1994. EPA raised concerns about the Site's contamination with arsenic, lead, and polynuclear aromatic hydrocarbons ("PAHs").

36. From 1994 through 2001, EPA fenced off a portion of the landfill, removed up to two feet of soil in some (but not all) areas, placed a permeable "geotextile mat" over contaminated soils in some (but not all) areas, and covered some (but not all) contaminated soils with approximately one foot of soil. EPA also performed some grading work in an attempt to direct contaminated runoff away from residential areas.

37. EPA did not replace soil or install a geotextile mat on at least nine residential properties at Gordon Plaza where residents did not voluntarily allow access. EPA had and has a right of access under 42 U.S.C. § 9604.

38. EPA did not replace soil under roads, sidewalks, or buildings.

39. EPA did not perform or require a groundwater cleanup.

40. EPA did not set cleanup standards for residential areas at the Agriculture Street Landfill.

41. EPA did not perform remedial action at the Agriculture Street Landfill.

42. Neither EPA nor any other entity is performing a removal action at the Agriculture Street Landfill.

43. On April 4, 2002, EPA announced it would require "no further remedial action" at the Agriculture Street Landfill. On this date EPA published a "Final Closeout Report" stating that EPA "completed all response actions for the Agriculture Street Landfill site in accordance with Close Out Procedures for National Priorities List Sites."

44. EPA deleted two areas of the Agriculture Street Landfill site from the National Priorities List on June 15, 2000 and has announced its intention to delete the entire site from that list.

45. In 2005, Hurricane Katrina further devastated the Agriculture Street Landfill, forcing residents to leave their homes to escape the flooding.

46. Post Hurricane Katina, the U.S. Agency for Toxic Substances and Disease Registry ("ATSDR")—a federal public health agency of the U.S. Department of Health and Human Services—concluded that "PAH concentrations pose an indeterminate public health hazard at the [Agriculture Street Landfill] site."

47. Flooding and time have eroded the inconsistent soil cover that EPA installed to limit residents' exposure to landfill waste.

48. EPA's geotextile mat that indicates the border between EPA's fill and landfill toxics is now exposed in places and missing in others.

49. Contaminated soil has washed out from under homes and thus further contaminated the surrounding area.

50. Subsidence and washout of soils beneath residential homes pose an ongoing risk of structural failure and new pathways of exposure to contaminated soil.

51. Results of EPA sampling conducted in October 2017 show that benzo(a)pyrene exceeded the EPA screening level at 50% of the locations that EPA tested for polynuclear aromatic hydrocarbons ("PAHs").

52. Results of EPA sampling conducted in October 2017 show that benzo(a)pyrene exceeded the Louisiana Risk Evaluation/Corrective Action Program (RECAP) screening level at 25% of the locations that EPA tested for polynuclear aromatic hydrocarbons ("PAHs").

53. Results of EPA sampling conducted in November 2017 under the slab of a residence show that the level of benzo(a)pyrene was more than 20 times the EPA screening level.

54. With respect to EPA's November 2017 sampling under the slab of a residence, EPA recommended that follow-up sampling be conducted from inside the residence. No follow-up sampling occurred.

55. No government agency or other person has conducted sufficient soil sampling at the Agriculture Street Landfill to determine the extent to which hazardous constituents are present beneath yards and homes.

56. No government agency or other person has collected sufficient groundwater quality data or hydrogeological data at the Agriculture Street Landfill to assess the risk that contaminated groundwater will further contaminate the landfill's residential area during storm-related flooding.

57. No government agency or other person has conducted sufficient investigation at the Agriculture Street Landfill to determine the risk that storm water runoff from the unimproved portion of the landfill will further contaminate the landfill's residential area.

58. No government agency or other person has conducted sufficient investigation at the Agriculture Street Landfill to determine the health impacts on people who eat produce from trees and gardens located on top of the abandoned dump site, including locations where roots would encounter landfill material.

59. No government agency or other person has conducted sufficient investigation at the Agriculture Street Landfill to determine the extent to which soil subsidence has occurred

beneath houses located on top of the dump site and how such subsidence effects the mobilization of vapors and allows them to collect beneath structures.

60. No government agency or other person has conducted sufficient investigation at the Agriculture Street Landfill to assess vapor intrusion risks of organic contaminants from the abandoned dump site.

61. Plaintiff's members are living, and have been living for years, amid blighted buildings while facing the risks of toxic chemical exposures.

*Chemicals and Health Effects*

62. The Agriculture Street Landfill is contaminated with arsenic, lead, and polynuclear aromatic hydrocarbons ("PAHs") among a large number of toxic materials, many of which are associated with cancer.

63. Waste at the landfill poses the risk of public exposure to at least the following chemicals at levels in excess of safe concentrations.

| | | | |
|---|---|---|---|
| Arsenic | Thallium | Dibenzo(a,h)anthracene | 4, 4' DDD |
| Beryllium | Benzo(a)anthracene | Indeno(1,2,3-cd)pyrene | Dioxins |
| Chromium | Benzo(a)prene | Arochlor 1248 | Furan |
| Cobalt | Benzo(b)fluoranthene | Arochlor 1254 | |
| Copper | Benzo(k)fluoranthene | Arochlor 1260 | |
| Lead | | | |

64. There is no safe level of lead exposure with respect to developmental impacts on children. In addition, lead can damage every organ system, and the nervous system is especially sensitive to lead exposure.

65. Arsenic is a known carcinogen and can harm health through ingestion, skin contact, and inhalation.

66. Exposure to polynuclear aromatic hydrocarbons ("PAHs") can cause various types of cancer including lung, skin, and bladder cancers.

67. Beryllium exposure can cause scarring lung disorders where oxygen cannot move freely from lungs to the blood supply, lung cancer, pneumonia, chest pain, dermatitis, and other breathing difficulties.

68. Chromium compounds are human carcinogens. Exposure to chromium can occur through inhalation and ingestion. Breathing chromium can cause asthma and stomach irritation including ulcers.

69. In addition to carcinogens, the chemicals present at the Site contain teratogens and mutagens. Teratogens can cause birth defects. Mutagens can cause genetic damage.

70. Dioxin exposure can cause skin lesions, liver damage, immune and nervous system damage, and disruptions in the reproductive system. Furans are in a similar class of chlorinated aromatic organic compounds as dioxins.

71. Chemicals in the Agriculture Street Landfill comprise a toxic stew, with synergistic and cumulative impacts on the health and welfare of residents.

*Other Allegations of Fact*

72. Location of a housing development on top of a municipal landfill is not prudent in terms of public health.

73. Agriculture Street Landfill residents may be subject to an elevated probability of developing adverse health effects due to contaminants in the landfill.

74. No state or federal agency has ever performed a risk assessment that evaluates cumulative effects of residential exposures to the mixtures of chemicals present at the Agriculture Street Landfill.

75. No state or federal agency has ever performed a risk assessment that evaluates synergistic effects of residential exposures to the mixtures of chemicals present at the Agriculture Street Landfill.

76. Since 1995, no state or federal agency has ever performed a risk assessment that evaluates risks to public health at the Agriculture Street Landfill.

77. Since 1995, no state or federal agency has performed an assessment of potential residential exposures to dangerous chemicals at the Agriculture Street Landfill.

78. Engineered barriers to public exposures to environmental contaminants at the Agriculture Street Landfill have not been applied consistently.

79. Because of contamination at the Agriculture Street Landfill, property owners at the site are denied unrestricted use of their property. For example, residents are prohibited from digging deeper than 18" without providing notice to the City.

80. The City has no intention of allowing residential development of the undeveloped area of the landfill because of contamination concerns.

81. EPA issued a directive in 1993 that provides guidance for remedial action at municipal landfills. In that document, EPA specified that "future residential use of the landfill source area itself is not considered appropriate …." EPA, *Presumptive Remedy for CERCLA Municipal Landfill Sites* at p. 5 (EPA 540-F-93-035, Sept. 1993).

82. Full remediation of the Agriculture Street Landfill may require removal of all houses, streets, sidewalks, and other structures, and replacement after remediation is complete.

*Legal Background*

83. RCRA's "imminent hazard" provision, 42 U.S.C. § 6972(a)(1)(B), confers upon courts "the authority to eliminate any risks posed by toxic wastes." *Interfaith Community Organization v. Honeywell Intern., Inc.*, 399 F.3d 248, 260 (3d Cir. 2005) (internal quotation marks and citations omitted). To prevail in a RCRA "imminent hazard" case:

> [P]laintiffs need only demonstrate that the waste ... "may present" an imminent and substantial threat.... Similarly, the term "endangerment" means a threatened or potential harm, and does not require proof of actual harm.... The endangerment must also be "imminent" [meaning] threatens to occur immediately.... Because the

> operative word is "may," however, the plaintiffs must [only] show that there is a potential for an imminent threat of serious harm ... [as] an endangerment is substantial if it is "serious" ... to the environment or health.

399 F.3d at 258 (quoting *Parker v. Scrap Metal Processors, Inc*., 386 F.3d 993, 1015 (11th Cir. 2004), and citing *Cox v. City of Dallas*, 256 F.3d 281, 300–01 (5th Cir. 2001)).

## CAUSE OF ACTION

84. The Resource Conservation and Recovery Act provides that any person may bring suit "against any person … including any… past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B).

85. Liability under 42 U.S.C. § 6972(a)(1)(B) is strict, joint, and several.

86. Defendants are present and past owners and operators of a disposal facility and have contributed to the handling and disposal of solid and hazardous waste that may present an imminent and substantial endangerment to health or the environment.

87. Defendants have handled and disposed of solid and hazardous waste that may present an imminent and substantial endangerment to health and the environment because, as a result of Defendants' handling and disposal of waste at the Agriculture Street Landfill, Plaintiff's members risk exposure to toxic chemicals that has threatened and will threaten their health and the health of their loved ones, family members, and neighbors.

88. Defendants have handled and disposed of solid and hazardous waste that may present an imminent and substantial endangerment to health and the environment because, as a result of Defendants' handling and disposal of waste at the Agriculture Street Landfill, Plaintiff's

members' and other landfill residents' reasonable concerns about exposure to toxic chemicals causes them stress that puts their health at risk.

89. Defendants have handled and disposed of solid and hazardous waste that may present an imminent and substantial endangerment to health and the environment because, as a result of Defendants' handling and disposal of waste at the Agriculture Street Landfill, the Agriculture Street Landfill has become and remains blighted with myriad abandoned and damaged buildings, alongside razed and abandoned sites, that attract vermin and criminals, endangering the health and welfare of Plaintiff's members and other residents of the landfill. The blight in the community is due to the toxic nature of the landfill, which prevents rebuilding of a viable neighborhood on top of the landfill. As a result, residents have been living for years in the midst of crumbling garbage-filled buildings while facing the risks of toxic chemical exposures.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Declare that conditions at the Agriculture Street Landfill may present an imminent and substantial endangerment to health or the environment;

B. Order the defendants to perform an environmental quality analysis, according to a plan approved by this Court, that fully documents the nature and extent of environmental contamination at the Agriculture Street Landfill;

C. Order the defendants to perform a risk assessment, according to a plan approved by this Court, that fully documents the nature and extent of the risks from environmental contamination at the Agriculture Street Landfill;

D. Order the defendants to fully abate the endangerment at the Agriculture Street Landfill, according to a plan approved by this Court, such that residents of the Agriculture Street Landfill enjoy full use of their property without any non-trivial increase in risk;

E. To the extent that full abatement of endangerment at the Agriculture Street Landfill requires destruction and replacement of roads, sidewalks, residential structures, and other physical features at the Agriculture Street Landfill, order that such features shall be replaced so that they are at least equal in amenity to the existing structures;

F. Grant other relief such as this Court deems proper; and

G. Grant an award of litigation costs, including reasonable attorney fees and expert witness fees, pursuant to 42 U.S.C. § 6972(e).

Respectfully submitted on May 15, 2020,

/s/ Austin Pratt
Austin Pratt, Student Attorney
Tulane Environmental Law Clinic

/s/ Lauren E. Godshall
Lauren E. Godshall (La. Bar No. 31465), T.A.
Lisa W. Jordan (La. Bar No. 20451)
Tulane Environmental Law Clinic
6329 Freret Street
New Orleans, LA 70118-6348
Phone: (504) 862-8818
Fax: (504) 862-8721
lwjordan@tulane.edu
lgodshall@tulane.edu

/s/ Adam Babich
Adam Babich (La. Bar No. 27177)
6329 Freret Street, Suite 259F
New Orleans, LA 70118-6348
Phone: (504) 862-8800
ababich@tulane.edu

*Counsel for Plaintiff Residents of Gordon Plaza, Inc.*

**SUPERVISING ATTORNEY'S INTRODUCTION OF STUDENT PRACTITIONER PURSUANT TO LOCAL RULE 83.2.13, WITH ATTACHED DEAN'S CERTIFICATION AND CLIENT'S WRITTEN CONSENT**

---

The undersigned counsel respectfully introduces law student practitioner Austin Pratt to this Court pursuant to Local Rule 83.2.13. Mr. Pratt is duly enrolled in Tulane Law School, a law school approved by the American Bar Association. He has completed five full-time semesters of legal studies and has taken the oath set forth in Local Rule 83.2.13. As the student practitioner's supervising attorney, I approve of the student practitioner's appearance in this case. Further, a Dean's certification relating to Mr. Pratt is attached as Exhibit 6. Plaintiff's written consent to appearances by student practitioners on its behalf is attached as Exhibit 7.

Respectfully submitted on May 15, 2020,

TULANE ENVIRONMENTAL LAW CLINIC

/s/ Lauren E. Godshall
Lauren E. Godshall (La. Bar No. 31465), T.A.
Instructor, Tulane Environmental Law Clinic
6329 Freret Street
New Orleans, LA 70118-6321
Phone: (504) 862-8818
Fax: (504) 862-8721
lgodshall@tulane.edu
*Counsel for Plaintiff Residents of Gordon Plaza, Inc.*